Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3880 | **DATE** | 2/14/2002 |
| **CASE TITLE** | Nasti vs. World Book, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER memorandum opinion and order. The Plaintiff's motion for summary judgment is denied on all counts, and the defendant's motion is granted on all counts. This case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | FEB 15 2002 | 27 |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| JD | courtroom deputy's initials | 02 FEB 14 PM 4:43 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |


DOCKETED
FEB 1 5 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES NASTI,            )<br>                         )<br>    Plaintiff,          )<br>                         )<br>    v.                   )<br>                         )<br>WORLD BOOK, INC.; WORLD BOOK )<br>INC, SEVERANCE PAY BENEFIT )<br>PLAN; and WORLD BOOK, INC. )<br>SEVERANCE PAY BENEFIT PLAN )<br>ADMINISTRATOR,          )<br>                         )<br>    Defendant.           ) | No. 00 C 3880<br>Judge Ronald A. Guzmán |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Nasti brought this four count action against Defendants World Book, Inc., World Book Inc. Severance Pay Benefit Plan, and World Book, Inc. Severance Pay Benefit Plan Administrator (collectively "World Book") alleging that he was denied ten years of severance pay owed to him under two different severance pay plans. Counts I and III are state-law breach of contract claims, arising out of the two separate severance plans which are in question. Alternatively, Nasti brings Counts II and IV, predicated on the same severance programs but under the Employee Retirement Income Security Act ("ERISA,") 42 U.S.C. 1001 *et seq.* (1996). Now pending before the court are the parties' cross-motions for summary judgment as to all counts. For the reasons set forth herein, Nasti's motion is denied as to all counts, World Book's motion is granted as to all counts, and this case is hereby terminated.

## BACKGROUND

The undisputed facts are taken from the parties' Local Rule 56.1 (a) & (b) statements of material fact.

In 1986, James Nasti was hired by World Book, Inc. as an Assistant Controller. (Def.'s LR 56.1(a)(3) ¶ 3.) At the time he was hired, his direct supervisor, Jack Dunholter, handed him a single sheet of paper that contained World Book's severance policy AC-6. (Pl.'s LR 56.1(a)(3) ¶ 8.) The policy covered, among other employees, World Book officers and key management personnel, providing one month of severance for every year of employment with World Book. *Id.* A participant covered by AC-6 who was involuntarily terminated for reasons other than cause could receive a minimum of one month and a maximum of twelve months severance for each year worked, in addition to 30 days of medical coverage. (Def's LR 56.1(a)(3) ¶ 10) These benefits were paid out of World Book's general assets. (Id. at ¶ 11.) At that time, Dunholter told Nasti that he was a "key management employee" and that as such, if World Book ever fired him, he would be entitled to severance pay under policy AC-6. (Pl.'s LR 56.1(a)(3) ¶ 9.) In 1988, Nasti was promoted to Controller, and again 1990 to the position of Vice-President and Controller, an officer of World Book. (*Id.* ¶ 6.) Mr. Nasti would then be promoted in 1993 to Vice-President of Finance and Business Services, in 1996 to Vice-President of Canadian Operations, and again in 1997 to Vice-President of International Operations. *Id.* Nasti would remain an officer and "key management employee" of World Book until the company was downsized in February of 1998. (*Id.* ¶ 10.)

On November 15, 1995, World Book replaced policy AC-6 with its Severance Pay Benefit Plan. ("1995 Plan") (Def's LR 56.1(a)(3) ¶ 12.) The introduction to the Summary Plan Description ("SPD") for the 1995 plan provides that the 1995 plan was adopted "to replace all

2

prior severance pay benefit plans." (Id. at ¶ 13.) Intended to supersede any previous severance pay plans, the new plan provided "Managerial Regular Employees" with one week of severance pay for each year of service, up to a maximum of 13 weeks. (Id. at ¶ 12-14.) Payments would not be made if the Employee failed to sign a release of claims against the company in the form required by the company. (Id. at ¶ 19-20.) Aside from his refusal to sign the release, James Nasti otherwise qualified for severance benefits under the 1995 Plan. (Id. at ¶ 22.)

On July 3, 1998, Nasti, through his attorney, submitted to the Plan Administrator a claim for benefits under policy AC-6. (Id. at ¶ 24.) The Plan Administrator had discretionary authority to interpret the provisions and eligibility requirements of the Plan, and on August 25, denied his claim on the grounds that 1995 Plan revoked all previous severance plans. (Id. at ¶ 25-26.) The Administrator held that Nasti's entitlement to severance benefits, at the time of his termination, was governed exclusively by the Severance Plan. (Id. at ¶ 28.) The Administrator further held that Nasti's refusal to sign the release agreement rendered him ineligible for benefits under the plan. (Id. at ¶ 29.) On October 22, Nasti appealed the Plan Administrator's denial of his claim for severance benefits, resting on the same grounds as his original application. (Id. at ¶ 30.) On December 30, the original decision was upheld, again because under the terms of the new agreement, the terms that Nasti sought to enforce were no longer in effect, and because he failed to sign the release agreement. (Id. at ¶ 31-33.)

## DISCUSSION

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . ." Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the Court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate through specific evidence that there remains a genuine issue of material fact and show that a rational jury could not return a verdict in the non-moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-27 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986).

Counts I and III are state-law claims for breach of contract, pursuant to both the AC-6 and the 1995 Plan. Counts II and IV are brought alternatively under ERISA. However, any state-law claims for breach of contract that arise out of a dispute regarding an employee benefit plan "relate to" the plan and therefore are preempted by ERISA. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62-63 (1987). Thus, as jurisdiction in this court is predicated solely on Counts II and IV, we begin by examining whether AC-6 and the 1995 Plan are, in fact, ERISA plans.

4

## I. Applicability of ERISA

An employee benefit plan will fall into two categories within ERISA: "retirement or pension" benefits and "welfare" benefits. 29 U.S.C. § 1002(1)-(2). Although ERISA imposes strict accrual, vesting, and funding requirements on retirement or pension plans, it does not on welfare benefits. 29 U.S.C. §§ 1051, 1081. Severance packages, if they qualify, are considered welfare benefits, and thus are not as severely restricted as retirement or pension benefits. *Young v. Standard Oil, Inc.*, 849 F.2d 1039, 1045 (7th Cir. 1988.), *cert. denied*, 488 U.S. 981 (1988); *Holland v. Burlington Industries, Inc.*, 772 F.2d 1140, 1145 (4th Cir. 1985), *aff'd* 477 U.S. 901, *cert. denied*, 477 U.S. 903 (1986). Moreover, an employer acts in a dual capacity as both the manager of its business and as a fiduciary with respect to unaccrued benefits. *Young*, 849 F.2d 1045. Thus, an employer may unilaterally amend or eliminate a severance plan without violating ERISA. *Id.*

However, in order for a severance package to come within the ambit of ERISA, it must employ an "ongoing administrative scheme." *See Fort Halifax Packing Co.,, Inc. v. Coyne*, 482 U.S. 1, 11-12 (1987); *Bowles v. Quantum Chemical Co.*, 266 F.3d 622, 631 (7th Cir 2001). To further explain the meaning of the term "ongoing," the court held that, if under the agreement, the employer has not assumed a responsibility to process claims and pay benefits "on a regular basis," it "faces no periodic demands on its assets that create a need for financing and control," and a benefit plan subject to ERISA has not been established. *Id.* at 12, 107 S.Ct. 2211. An employer's obligation may not be satisfied merely by "cutting a single check and making a single set of payments." *Bowles*, 266 F.3d at 631, *quoting Collins v. Ralston Purina Co.*, 147 F.3d 592, 595 (7th Cir. 1998). Rather, where a severance plan requires an employer to make "nonclerical judgment calls" on multiple occasions, an ongoing administrative scheme is

5

implicated. *Collins,* 147 F.3d at 597 *citing Delaye v. Agripac, Inc.,* 39 F.3d 253, 238 (9th Cir. 1994) (stating that a welfare plan subject to subjective criteria, rather than arithmetical calculations or clerical determinations, implicates ERISA). Simple or mechanical determinations do not necessarily require the establishment of ... an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria. *Cvelbar v. CBI Ill. Inc.,* 106 F.3d 1368, 1375 (7th Cir. 1997).

The AC-6 policy satisfies this standard. Nasti contends that Policy AC-6 and the 1995 plan fall within the exception outlined in *Fort Halifax* because the disbursement of benefits required nothing more than a straightforward calculation of an applicable amount. *See Fort Halifax,* 482 U.S. 11-12. However, the administration of the AC-6 policy required the plan administrator to make an individualized determination of an employee's classification as a key management employee or officer, whether that employee left the company voluntarily or involuntarily, calculating the amount of severance pay due, and administering other welfare benefits such as outplacement services and medical insurance coverage. (Def's LR 56.1(a)(3) ¶¶ 9-10.) Moreover, the fulfillment of AC-6 was not contemplated on the occurrence of a single event, as in *Fort Halifax,* but rather applied to employees for several years until it was replaced. *See Collins,* 147 F.3d at 595-96. It was used on an ongoing basis, and two, possibly three employees received benefits under the plan. (Def.'s LR 56.1(b)(3)(B) ¶¶ 3-5.)

The 1995 plan likewise also falls within the scope of ERISA. It requires the plan administrator to make a determination of whether the employee's former position qualified him or her for benefits, whether their termination was for cause, and extends the same outplacement

services and medical benefits to former employees. (Pl.'s Ex. D.) Although the plan does not provide for outplacement services and extension of medical benefits, it does provide a supplemental severance plan, which further compensates employees on a weekly basis should they receive weekly state unemployment compensation payments. *Id.; See Fort Halifax,* 482 U.S. at 11-12 : *see also Collins,* 147 F.3d at 596. The fact that the severance payments were paid out of World Book's general assets rather than out of an ERISA trust is not outcome determinative. Some severance plans such as "top hat" are subject to ERISA' enforcement provisions even through [the plan] is exempted from ERISA's vesting, participation, funding and fiduciary rules. See *Olander v. Bucyrus - Erie Co.,* 187 F. 3d 599, 604 (7th Cir. 1999).

Because we hold that both the AC-6 and 1995 severance plans are ERISA "welfare benefit plans," they necessarily pre-empt Counts I and III, which are state-law claims for breach of contract. World Book's motion as to Counts I and III is granted, and these claims are dismissed.

## II. ERISA Claims

The remaining counts against World Book allege alternatively that it improperly denied Nasti benefits either under the AC-6 or 1995 severance plans. These claims must also fail. As previously stated, severance plans that fall under ERISA are not subject to the same accrual and vesting requirements as pension benefits. *Young,* 849 F.2d 1045. Unless an employer contractually cedes its freedom, it is "generally free under ERISA, for any reason at any time, to adopt, modify, or terminate [its] welfare pla [n]." *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.,* 520 U.S. 510, 151 (1997) (citing *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78 (1995).). An employer's decision to vest severance benefits

7

will not be inferred lightly—the intent to vest "must be found in the plan documents and must be stated in clear and express language." *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (quoting *Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 937 (5th Cir.), *cert. denied*, 510 U.S. 870 (1993). Where a severance plan gives the Plan Administrator discretionary authority, a determination of eligibility will be overturned only if it is "arbitrary and capricious." *Mers v. Mariott Int'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1020 (7th Cir. 1998).

In Count II Nasti claims that because World Book did not explicitly reserve the right to amend the AC-6 policy, it may not now exercise that freedom. However, Courts of Appeal since *Atchison* have been unwilling hold that an employer agreed to vest such benefits without clear and express language. *See Sprague*, 133 F.3d at 400; *see also International Union U.A.W. Local No. 1697 v. Skinner Engine Co.*, 188 F.3d 130, 139 (3d Cir. 1999) (holding that an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language . . . ); *Wise*, 986 F.2d at 937 (applying "clear and express language" standard). Nasti, however, has failed to produce any language whatsoever that indicates an intention on the part of World Book to vest its employees with these benefits. Absent such a showing, this Court is simply unwilling to hold that World Book intended the AC-6 policy to vest in its employees. The World Book severance policy AC-6 was fully revocable, and thus Nasti is not entitled to any of its severance benefits. Furthermore, at the time Nasti was terminated, he was a Vice President which would have brought him under the AC - 7 plan which was clearly amended by the 1995 plan. Count II is therefore dismissed.

In Count IV Nasti also challenges the World Book Plan Administrator's decision to refuse him benefits under the 1995 plan. Where a summary plan description gives the

8

Administrator full discretionary authority to interpret the terms of the plan, to determine eligibility under the plan, and to determine entitlement to plan benefits, the arbitrary and capricious standard of review will be applied. *Mers*, 144 F.3d at 1019. Under the 1995 plan, the World Book Plan Administrator has such powers. (Def.'s LR 56.1(a)(3) ¶ 25.)

Pursuant to clear language in the SPD, the Plan Administrator initially determined that the 1995 plan revoked all previous severance pay plans and the 1995 plan was Nasti's exclusive severance pay option. (*Id.* ¶ 27-28.) The Plan Administrator then ruled that Nasti's failure to sign a waiver of claims agreement, which according to the SPD is a requirement of eligibility, rendered him ineligible for benefits under the 1995 plan. (*Id.* ¶ 29.) We therefore find that James Nasti was not improperly denied benefits under the 1995 severance plan, and Count IV is thus dismissed.

## Conclusion

For the foregoing reasons, the Plaintiff's motion for summary judgment is denied on all counts, and the Defendant's motion is granted on all counts. This case is hereby terminated.

**IT IS SO ORDERED**

ENTERED: 2/14/02

HON. RONALD A. GUZMAN
**United States Judge**

9